[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10801

_____

ERIC JOHN HORACIUS,

Plaintiff-Appellee,

*versus*

ANNE CATHERINE RICHARD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:23-cv-62149-KMM

_____

Before NEWSOM, LUCK, and ABUDU, Circuit Judges.

PER CURIAM:

Anne Catherine Richard appeals an order of the district court, entered after a bench trial, granting Eric John Horacius's petition for the return of Richard's and Horacius's minor child, A.H.,[1] to Canada under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011. After careful review of the record, and with the benefit of oral argument, we affirm the district court's order.

## I. FACTUAL BACKGROUND

Richard and Horacius were married in Canada in 2018. Horacius is a dual citizen of the United States and Canada. Richard, who is originally from Haiti, and A.H. are Canadian citizens. At the time of A.H.'s birth, in March 2020, Richard and Horacius lived together in Quebec.

Around December 2020, when A.H. was nine months old, Richard and Horacius took A.H. to the Dominican Republic to visit Richard's parents. The parties left the Dominican Republic in February 2021 and traveled directly to Florida. From February 2021 until the alleged wrongful retention began in March 2022, A.H. lived with Richard and Horacius at the home of Richard's sister in Miramar, Florida, "by mutual agreement of the parties." A.H. has

---

[1] We refer to the minor child throughout this opinion using her initials for the sake of privacy.

biological brothers, grandparents, and extended family in both Canada and Florida.

While living with Richard and A.H. in Florida, Horacius: (1) obtained a Florida driver's license using Richard's sister's Miramar address; (2) applied for and received a notary commission in Florida using the Miramar address; (3) obtained a Florida concealed weapons permit using the Miramar address; and (4) registered to vote in Florida and maintained active voter status there at the time of trial. Horacius also filed affidavits of support with United States immigration authorities for Richard and A.H. to become permanent United States residents, and he listed the Miramar address as his residence on the affidavits.

In January 2022, after A.H. had been living in Florida for nearly a year, Horacius left and returned to Canada alone. The following month, in February 2022, Richard filed a divorce petition against Horacius in Florida state court. Horacius then purchased and sent airline tickets for Richard and A.H. to return to Canada around March 2022, but Richard refused to return.

## II.    PROCEDURAL HISTORY

Richard's refusal to return with A.H. to Canada, in March 2022, marked the point at which the alleged wrongful retention began. Horacius filed his ICARA petition in November 2023. By the time of trial, in January 2024, A.H. had been living in Florida for nearly three years. In his petition, Horacius alleged that Richard was wrongfully retaining A.H. in Florida despite his requests that A.H. be returned to Canada. He contended that A.H.'s "habitual

residence" was Canada and that Richard's retention of A.H. in Florida violated rights of custody afforded him by Canadian law.

Richard answered the petition and admitted that she refused to return A.H. to Canada and that Horacius had custody rights that he had been exercising at all relevant times. However, Richard denied that A.H. was a habitual resident of Canada and asserted, instead, that the United States had become A.H.'s habitual residence after A.H. relocated there by mutual agreement of both parents in February 2021. Richard further asserted that, even if Horacius could establish a *prima facie* case of wrongful retention under ICARA, his petition still should be denied based on her affirmative defense that A.H. had become well-settled in Florida.

### A. Factual Issues for Trial

Although the parties stipulated to several facts alleged in Horacius's petition, the remaining issues to be litigated at trial included whether: (1) Horacius intended his, Richard's, and A.H.'s entry into the United States to be temporary or permanent; (2) Richard's conduct, beginning in March 2022, amounted to a wrongful retention of A.H. that violated Horacius's custody rights under Canadian law; (3) A.H. had been a "habitual resident" of the United States or Canada immediately prior to the wrongful retention in March 2022; and (4) A.H. had become well-settled in her new environment such that the court should deny the petition for her return even if Horacius established a *prima facie* case of wrongful retention.

24-10801                Opinion of the Court                5

Regarding the first disputed fact, Horacius testified that Richard repeatedly assured him that the trip to Florida would be temporary, and he only agreed to travel there so that Richard's family could meet A.H.  As evidence that the family planned to return to Canada, Horacius noted that immediately after A.H.'s birth, she had been placed on a waiting list to attend daycare in Canada and the family's belongings had been kept in a storage unit in Canada while they were in Florida.  He asserted that because Richard and A.H.'s applications for permanent-resident status were submitted while they were in the United States, they could not return to Canada during the pendency of their applications without the applications being cancelled.  However, if Richard and A.H. returned to Canada and submitted the applications to become permanent residents of the United States from Canada, there would not have been any travel restrictions.

Upon further questioning about whether he intended to remain in Florida permanently, Horacius conceded that he had met with realtors in Florida to discuss purchasing a home there, but he maintained that any home he purchased would have been an investment property that he rented out while living in Canada rather than a permanent residence in the United States.  He also acknowledged that he had obtained a Florida phone number while living in Florida and that he and Richard had ended their lease for their condominium in Canada while they lived in Florida.  Nevertheless, he maintained that he never intended to live in Florida permanently.

In contrast, Richard testified that before the alleged wrongful retention began, she and Horacius had already decided to move to Florida with A.H. "full time." She stated that Horacius did not begin expressing reluctance about living in Florida until around the time that he moved back to Canada. She denied ever telling Horacius that she and A.H. planned to return to Canada, and she highlighted that the family had purchased one-way airline tickets to Florida that did not include a return flight to Canada.

When questioned about Horacius's custody rights over A.H., Richard agreed that Horacius had "parental rights as it relates to A.H.," and that he "should be involved in major decisions involving A.H." She also conceded that she had made "major decisions such as schooling and medical treatment for A.H. without first speaking" to Horacius.

Additional testimony established that A.H. had not been back to Canada since she left at nine months old, she did not have any friends in Canada, and she never attended daycare or school there. However, while living in Florida, A.H. had developed a "social network" that included her cousins, schoolmates, and other children who played on her brother's soccer team. A.H. frequently had "play dates" with other children in Florida, she attended a church and daycare in Florida, and her pediatrician's office was in Florida. According to Richard, A.H. had never asked about Canada and considered Florida to be her home.

### B. The District Court's Decision

The district court ultimately granted Horacius's petition in an order containing its "findings of fact and conclusions of law." The court first determined that Horacius had established a *prima facie* case of wrongful retention by showing that: (1) A.H. had been kept outside her country of habitual residence such that a "retention" had occurred; and (2) the retention violated Horacius's rights of custody under Canadian law, making it "wrongful."  After noting that habitual residence is determined at the point in time immediately before the retention—*i.e.*, when Richard refused to return A.H. to Canada in March 2022—the court found that "[t]he relevant objective facts" satisfied Horacius's "burden of establishing Canada as A.H.'s habitual residence . . . ."  The court reasoned that Richard and Horacius "did not have a shared settled intention to change A.H.'s habitual residence from Canada to the United States," A.H. had been born in Canada, the family's belongings remained in Canada while they were in Florida, and Richard and A.H. had only temporary immigration status in the United States.  The court concluded that the fact that A.H. had "lived in the United States for longer than she ever lived in Canada d[id] not disturb th[e] analysis" because Richard's retention of A.H. in Florida could not "suffice to create a new habitual residence . . . ."

Turning to the wrongfulness of the retention, the court determined that Richard violated Horacius's rights of custody under Canadian law by retaining A.H. in the United States without Horacius's consent.  After citing Article 4, Section 599 of the Civil

Code of Québec,[2] the court noted that neither party disputed that Horacius had custody rights, including rights related to supervision and schooling of A.H.  The court reasoned that Horacius had been exercising his custody rights when the retention began and that he "continued to exercise his rights . . . even after [Richard] unilaterally decided to keep A.H. in the United States and refused to return to Canada with her."  The court concluded that Richard's "retention of A.H. in the United States breached [Horacius]'s custody rights, which he was exercising at the time of A.H.'s retention."

Having determined that Horacius established a *prima facie* case of wrongful retention, the court then turned to Richard's affirmative defense that A.H. had become well-settled in Florida. The court reasoned that although A.H. had spent most of her life in Florida, she was "only about four years old and did not participate in significant extracurricular activities in her community besides attending daycare for a few hours per day."  The court also noted that, depending on the outcome of the pending immigration proceedings, Richard could be forced to return to Canada.[3]  The court concluded that "[i]n light of A.H.'s young age, the fact that

---

[2] That provision states that "[t]he father and mother have the rights and duties of custody, supervision and education of their children."  Civil Code of Québec, 1991, c 64, art 599 (Can.).

[3] Following the bench trial, Richard filed a motion to reopen evidence for purposes of submitting documentation showing that United States immigration officials had granted A.H. authorization to remain in the United States until at least 2029.  The court denied the motion to reopen, and that ruling is not being challenged on appeal.

she has family in Canada, and" because Richard would "return to Canada if her immigration application is rejected," Richard "ha[d] not established that A.H. is well-settled in the United States . . . ." Alternatively, the court determined that even if Richard had met her burden, it would nevertheless exercise its "equitable discretion under the Hague Convention and order A.H.'s return to Canada."

The district court subsequently entered final judgment in Horacius's favor, and Richard timely appealed.

### III. STANDARDS OF REVIEW

Generally, we review questions of law *de novo* and questions of fact for clear error. *Monasky v. Taglieri*, 589 U.S. 68, 83 (2020). "A child's habitual residence presents . . . a 'mixed question' of law and fact—albeit barely so." *Id.* at 84 (quoting *U.S. Bank N.A. ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 386 (2018)). Because this mixed question is primarily factual, "[o]nce the trial court correctly identifies the governing totality-of-the-circumstances standard," its conclusion about the child's habitual residence is "judged on appeal by a clear-error review standard deferential to the factfinding court." *Id.*

When we review for clear error, we are deferential to the district court's view of the evidence. *Bellitto v. Snipes*, 935 F.3d 1192, 1197 (11th Cir. 2019). "A factual finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). Accordingly, "[w]here

there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S at 574.

In addition, "[w]hen findings are based on determinations regarding the credibility of witnesses," we must give "even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575.

ICARA requires that children who are wrongfully retained should "be promptly returned unless one of the narrow exceptions set forth in the [Hague] Convention applies." 22 U.S.C. § 9001(a)(4). One of the Hague Convention's "narrow exceptions" to return provides that a court does not have to order a child's return if the child has become "settled" in the new country such that return would not be in the child's best interests. *Fernandez v. Bailey*, 909 F.3d 353, 358-60 (11th Cir. 2018). However, our precedent instructs that a court may order a child's return even if that exception to return is met. *Id.* at 363. We review that equitable determination—"to return or not to return a child"—for an abuse of discretion. *Id.* The abuse of discretion standard of review is also deferential, and "there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call." *Rasbury v. IRS (In re Rasbury)*, 24 F.3d 159, 168 (11th Cir. 1994). That is because "the abuse of discretion standard allows 'a range of choice for the district court, so long as that choice does

not constitute a clear error of judgment.'" *Id.* (quoting *United States v. Kelly*, 888 F.2d 732, 745 (11th Cir. 1989)).

## IV. DISCUSSION

On appeal, Richard argues that the district court erred in: (1) concluding that A.H.'s habitual residence was Canada; (2) determining that she had violated Horacius's rights of custody under Canadian law; and (3) rejecting her defense based on A.H.'s well-settled status in the United States. For the reasons stated below, we affirm the district court's factual findings and its exercise of discretion to return A.H. to Canada.

### A. Habitual Residence

A petitioner under ICARA must prove, "by a preponderance of the evidence, that the child was wrongfully removed or retained." *Calixto v. Lesmes*, 909 F.3d 1079, 1083 (11th Cir. 2018). Courts first look to whether a petitioner has made a *prima facie* showing that the child's retention is "wrongful" by demonstrating: (1) "the child was a habitual resident of another country at the time of the retention"; (2) "the retention breached his or her custody rights under the law of that other country"; and (3) "he or she had actually been exercising those custody rights at the time of retention." *Id.* at 1084.

Although neither the Hague Convention nor ICARA defines the term "habitual residence," our precedent interpreting the phrase has looked to whether a child has lived in the place with "a sufficient degree of continuity to be properly described as *settled*." *Id.* (emphasis in original) (quoting *Ruiz v. Tenorio*, 392 F.3d 1247,

12                    Opinion of the Court                    24-10801

1252 (11th Cir. 2004)).  When analyzing whether a child's habitual residence has changed from one country to another, we have "held that '[t]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind.'"  *Id.* (quoting *Ruiz*, 392 F.3d at 1252).  "The 'unilateral intent of a single parent,'" is not enough, standing alone, "to change a child's habitual residence."  *Id.* (quoting *Redmond v. Redmond*, 724 F.3d 729, 745 (7th Cir. 2013)).  Instead, "a court must . . . determine whether the parents or guardians . . . shared an intent to change the child's habitual residence."  *Id.*

Richard's first argument is that the district court erred in concluding that A.H.'s habitual residence was Canada.  She argues that A.H. spent significantly more time in the United States than Canada, and she points to several facts in the record that support a conclusion that she and Horacius shared an intent to live in the United States.  She notes that she and Horacius had obtained an early termination of the lease of their condominium in Canada; that Horacius obtained a Florida driver's license and Florida notary public commission using their address in Florida; and that Horacius sought to buy a home in Florida.

We begin our analysis by reiterating that the district court found Richard not to be credible regarding the parties' intention to relocate to the United States, and we must afford that finding significant deference.  *Anderson*, 470 U.S at 575.  The district court also correctly identified the applicable "totality-of-the-circumstances

standard," so our review of its conclusion about A.H.'s habitual residence is only for clear error. *Monasky*, 589 U.S. at 84.

While our review of the record evidence shows that it is a close call whether A.H.'s habitual residence was Canada, rather than the United States, we do not have a "definite and firm conviction that a mistake has been committed." *Bellitto*, 935 F.3d at 1197. Instead, the record contains sufficient evidence to support the district court's conclusion that Canada was A.H.'s habitual residence. Among this evidence is the fact that Richard stated that the family's stay would be temporary to obtain a B-2 visa when she entered the United States. In addition, Horacius's and Richard's belongings remained in a storage unit in Canada during their stay in Florida. Although Richard applied for American citizenship during her time in Florida, that application does not weigh heavily in her favor, as citizenship and residence are not coterminous. For instance, Horacius is a citizen of both Canada and the United States, but is only a resident of Canada.

Given the facts we have highlighted and the district court's credibility determination, we cannot say that the district court's view of the evidence was an impermissible one. *Anderson*, 470 U.S at 574-75; *Bellitto*, 935 F.3d at 1197. Therefore, Richard has not shown clear error in the district court's conclusion that A.H.'s habitual residence was Canada. *Anderson*, 470 U.S at 574.

### B. Breach of Custody Rights

The second and third prongs of Horacius's *prima facie* case required him to show that A.H.'s "retention breached

his . . . custody rights under the law of" Canada and that "he . . . had actually been exercising those custody rights at the time of retention." *Calixto*, 909 F.3d at 1084.

Richard does not dispute that Horacius had custody rights relating to A.H. under Canadian law, nor does she argue that he was not exercising those rights when the retention of A.H. began. She only disputes that her retention of A.H. breached Horacius's custody rights. However, she conceded at trial that Horacius "should be involved in major decisions involving A.H." and that she had made "major decisions such as schooling and medical treatment for A.H. without first speaking" to him. Richard's counsel also conceded at oral argument that Horacius was attempting to exercise his rights of custody both before and after he left Florida, including by insisting that A.H. return to Canada. We conclude that these concessions, when considered with the facts described above and our review of Canadian law, show that the district court's finding that A.H.'s retention violated Horacius's custody rights was, again, a "permissible view[] of the evidence." *Anderson*, 470 U.S at 574.

Because Richard has not shown clear error in this respect either, we affirm the district court's findings that A.H.'s retention breached Horacius's "custody rights under the law of Canada" and that Horacius "had actually been exercising those custody rights at the time of [A.H.'s] retention." *Calixto*, 909 F.3d at 1084. Horacius, therefore, established the second and third elements of his *prima facie* case. *Id.*

### C. Richard's Affirmative Defense

Finally, the district court found that Richard had not shown that A.H. was well-settled in the United States. Furthermore, even if she had, the district court ruled that it would exercise its discretion to order A.H.'s return. *See Fernandez*, 909 F.3d at 363. Because the latter ruling is dispositive, we do not address Richard's well-settled affirmative defense. *See Fla. Wildlife Fed'n Inc. v. United States Army Corps of Eng'rs*, 859 F.3d 1306, 1316 ("We may affirm the district court's ruling on any basis the record supports.").

Richard's briefing on appeal does not challenge the district court's alternative conclusion that it would exercise its discretion and order A.H. returned to Canada notwithstanding Richard's well-settled defense. Thus, we conclude that any challenge to the district court's ruling on that front is forfeited. However, even if we were to consider the issue, the district court did not make a "clear error of judgment" in ordering A.H.'s return. *Rasbury*, 24 F.3d at 168. On this record, the district court's decision was within its "range of choice" and we cannot conclude that it abused its discretion. *Id.*; *Fernandez*, 909 F.3d at 363.

## V. CONCLUSION

For the foregoing reasons, we affirm the district court's decision and judgment.

**AFFIRMED.**