# United States Court of Appeals

### For the Eighth Circuit

_____

No. 22-3048
_____

Eny Adamy Mejia Rodriguez

*Plaintiff - Appellee*

v.

Dennys Antonio Reyes Molina

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

_____

Submitted: November 15, 2023
Filed: March 25, 2024

_____

Before COLLOTON,[1] WOLLMAN, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

After Dennys Antonio Reyes Molina (Reyes) wrongfully removed his daughter from Honduras to the United States, the child's mother, Eny Adamy Mejia Rodriguez (Rodriguez), petitioned for the child's return under the Hague Convention on the

_____

[1]Judge Colloton became chief judge of the circuit on March 11, 2024. See 28 U.S.C. § 45(a)(1).

Civil Aspects of International Child Abduction, as implemented by the United States in the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001–9011. Reyes conceded wrongful removal, but argued that the child should not be returned because doing so would put her at grave risk of physical harm. After finding that Reyes had failed to prove any such grave risk by clear and convincing evidence, the district court[2] ordered that the child be returned to Honduras. We affirm.

Reyes and Rodriguez are citizens of Honduras. Their daughter was born in July 2016 in Honduras, where she lived with both parents for the first four months of her life. When her parents separated, the child continued to live in Honduras with Rodriguez and Rodriguez's son from a previous relationship.

Reyes took the child from her home on October 12, 2021. They walked from Honduras to Mexico, where Reyes paid someone to smuggle them into the United States. Reyes and the child settled in Des Moines, Iowa. All the while, Rodriguez attempted to secure the child's return, eventually filing a petition in federal district court in the Southern District of Iowa.

Before holding an evidentiary hearing on Rodriguez's petition, the district court entered an order instructing the parties "that the purpose of the proceedings is to adjudicate the petition pursuant to the Hague Convention and ICARA. It is not the role of the Court to adjudicate the merits of the underlying custody dispute." D. Ct. Order of Aug. 3, 2022. Throughout the hearing, the court repeatedly directed the parties to focus on whether the child's return would expose her to a grave risk of harm, reminding the parties that "[w]ho might be the better parent is not at issue" and that "this is not the custody battle." Tr. 32.

---

[2]The Honorable Stephanie M. Rose, Chief Judge, United States District Court for the Southern District of Iowa.

Reyes submitted evidence in support of his position that the child should not be returned to Honduras. He testified that Rodriguez had struck the child with a broom when the child was two years' old and that she had struck the child's back with an open hand or fist on multiple occasions beginning when the child was four years' old. According to Reyes, Rodriguez repeatedly hit the child with a belt after she had wet the bed, which caused the child to have additional similar incidents. Reyes testified that Rodriguez would not cease using physical punishment, despite his pleas that she do so, and that Rodriguez had hit him when he tried to intervene.

Reyes submitted eight photos that he had taken in early October 2021. The district court described five of the photos as showing significant bruises on the child's "back, buttocks, or legs consistent with being struck forcefully and repeatedly by a belt," while the other photos depicted mere scrapes. Mejia Rodriguez v. Molina, 628 F. Supp. 3d 905, 918 (S.D. Iowa 2022). Reyes's two sisters testified regarding instances of physical punishment, although their testimony lacked specific detail. One sister testified that, "in Honduras, it's okay to correct a child with a belt." Tr. 73. Reyes also submitted a recording of an angry, expletive-filled voice message from Rodriguez's ex-boyfriend.

Rodriguez admitted that she had once used a belt to discipline the child, after the child bullied and repeatedly slapped her brother. Rodriguez testified that she had never struck the child for urinating on herself, that she did not strike Reyes, that Reyes had never spoken with her about physical punishment, and that Reyes's sisters had had minimal involvement in the child's life. Rodriguez testified that she had no intention of using physical punishment to correct the child's behavior in the future, but instead would take away privileges or use time outs.

Rodriguez submitted several affidavits to establish that the child would not face a grave risk of harm if returned to Honduras. A teacher described Rodriguez as "responsible in her role as a mother" and "attentive to the learning process of her

son." The teacher stated that Rodriguez's children got along well and described the child as happy, sociable, and well-groomed. A fellow parent and the child's occasional daycare provider both stated that they had never seen signs of abuse or neglect. Another mother in the community stated that Rodriguez had taken care of the mother's son for two years and that Rodriguez kept the boy well-groomed, well-fed, and took "extra time to teach and play with the children." Rodriguez submitted more than 100 photos of the child, including ones in which the child embraced and kissed her mother, hugged her brother, attended birthday parties, enjoyed ice cream or meals, or simply smiled while posing.

The district court found that Rodriguez had physically punished the child for typical childhood behaviors "such as urinating in her bed, arguing with a sibling, or being energetic" and that Rodriguez had "physically abused the child on at least one occasion," *i.e.*, when she had struck the child with a belt. Mejia Rodriguez, 628 F. Supp. 3d at 916. The court did not fully credit Rodriguez's promise to not use physical punishment in the future or her explanation that she had changed her methods of discipline. The court found that the testimony was entitled to some weight, however, because Rodriguez "understands the looming custody battle she faces in Honduras and the likely impact abusive discipline would have on such litigation." Id. The court relied upon the affidavits in support of Rodriguez's petition to find that any future abuse by Rodriguez was "possible, but not highly probable." Id. at 917. The court also determined that the child's injuries—specifically, the bruises depicted in Reyes's photos—did not indicate that the child "would face a magnitude of physical harm that would allow the Court to lawfully decline to return the child to Honduras." Id. at 918. The district court ultimately concluded that Reyes had not proved by clear and convincing evidence that the child's return to Honduras would subject her to a grave risk of harm.

The Hague Convention "generally requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the

children have been wrongfully removed to or retained in the United States." Chafin v. Chafin, 568 U.S. 165, 168 (2013). Wrongfully removed or retained children "are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4). A child's return is not required, for example, if the respondent establishes that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13b. The respondent must establish the existence of this narrow exception "by clear and convincing evidence," 22 U.S.C. § 9003(e)(2)(A), meaning that he must show that a grave risk is "highly probable," see Colorado v. New Mexico, 467 U.S. 310, 316 (1984).

Whether the respondent has established "a grave risk of harm under the Hague Convention is a mixed question of law and fact that we review *de novo*." Acosta v. Acosta, 725 F.3d 868, 874 (8th Cir. 2013). We defer to the district court's credibility and factual findings, however, unless they are clearly erroneous. See id. at 871; Rydder v. Rydder, 49 F.3d 369, 373 (8th Cir. 1995). District courts must engage in "a fact-intensive inquiry" to determine whether the respondent has proved a grave risk of harm, which requires "careful consideration of several factors, including the nature and frequency of the abuse [and] the likelihood of its recurrence." Simcox v. Simcox, 511 F.3d 594, 608 (6th Cir. 2007). We thus are mindful of the Supreme Court's admonition that appellate courts should usually review with deference a mixed question that immerses a district court "in case-specific factual issues—compelling the [court] to marshal and weigh evidence [and] make credibility judgments." U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC, 583 U.S. 387, 396 (2018); see Monasky v. Taglieri, 140 S. Ct. 719, 730 (2020) (concluding that the determination of a child's habitual residence "should be judged on appeal by a clear-error review standard deferential to the factfinding court").

Reyes's first argument is that the evidence compels the conclusion that the child would face a grave risk of physical harm upon her return to Honduras. He

contends that Rodriguez's admission that she used a belt to discipline the child and the photos of the bruises inflicted upon the child during that beating, as well as the testimony and affidavits that she frequently hit her child, proved that Rodriguez would continue to use the same methods of discipline against the child upon her return.[3] He also argues that the blows constituted serious abuse. See Vasquez v. Colores, 648 F.3d 648, 650 (8th Cir. 2011) (a grave risk of harm may exist in cases involving "serious abuse or neglect").

In its analysis, the district court correctly identified Reyes's evidentiary burden and conducted its narrow inquiry "of whether the child will face immediate and substantial risk" of harm if she is returned to Honduras "pending final determination of [her] parents' custody dispute." Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995). The court did not fully credit Reyes's evidence, finding that it was only "possible" Rodriguez would continue to use physical punishment. The court relied on Rodriguez's testimony and her supporting affidavits in finding that it was not "highly probable" that the physical punishment would continue. The district court's credibility findings are not clearly erroneous; nor is its assessment of the risk of harm upon the child's return.

A matter of some concern arises from the fact that Rodriguez had "painfully injured her daughter" on at least one occasion by "forcefully and repeatedly" striking the child with a belt. Mejia Rodriguez, 628 F. Supp. 3d at 918. The harm inflicted on the child was more serious than in certain cases in which the exception did not apply, but not as severe as the cases in which there existed a grave risk of harm. See

---

[3]We reject Reyes's argument that the district court failed to accord adequate weight to the evidence that Rodriguez's ex-boyfriend had threatened Reyes and that Rodriguez herself had abused Reyes. The court found that the alleged threat was nothing more than "an inappropriate outburst," and that his abuse allegations were not credible. These findings are not clearly erroneous, and the evidence thus was not entitled to any weight.

Simcox, 511 F.3d at 609 (comparing cases). Even if the magnitude of the harm on that occasion constituted serious abuse, we cannot say that the district court clearly erred in finding that it was not "highly probable" that similar abuse would continue upon the child's return. See Van De Sande v. Van De Sande, 431 F.3d 567, 570 (7th Cir. 2005) ("The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." (citing Nunez-Escudero, 58 F.3d at 377)); see also Silverman v. Silverman, 338 F.3d 886, 900 (8th Cir. 2003) (en banc) (explaining that "to apply the Article 13(b) exception, the court would need to cite specific evidence of potential harm to the individual children"). The district court thus did not err in concluding that the grave-risk exception did not apply.

Reyes also argues that the court committed legal error when it decided the case, in part, on the basis of his actions. Reyes points to the following passage in the court's order:

> [T]he Court is equally unimpressed with the father's actions. Removing the child from her home and subjecting her to the known dangers of illegal smuggling operations to bring her to the United States without documentation or without a stable living arrangement is extremely risky and irresponsible behavior.
>
> Neither parent here has acted in a manner that prioritizes the child's safety and wellbeing.

Mejia Rodriguez, 628 F. Supp. 3d at 916. The court also stated that it could not "ignore how Respondent's choices presented serious risks to the health and safety of the child." Id. at 918. The court's commentary indicated that it was deeply troubled by both parents' decisions, but also recognized its limited role in "determin[ing] only rights under the Convention and not the merits of any underlying child custody claims." See 22 U.S.C. § 9001(b)(4). As set forth above, the court informed the parties before and during the hearing that it would not decide any custody issues, and its decision identified "the sole issue" as "whether Respondent has established the

-7-

applicability of a grave risk exception by clear and convincing evidence." <u>Mejia Rodriguez</u>, 628 F. Supp. 3d at 912. It moreover stated that "the narrow legal issue before the Court mandates that Honduran courts resolve these parenting deficiencies." <u>Id.</u> at 916. Viewing the record as a whole, we conclude that the district court did not rely on Reyes's actions in determining that he had not met his evidentiary burden and thus did not err in its grave-risk-exception analysis.

Reyes argues that the district court correctly identified that Rodriguez's "excessive disciplinary style for the young child must be expeditiously addressed and remedied," but erred by ordering the child's return in the absence of evidence of any measures to protect the child's safety. <u>Mejia Rodriguez</u>, 628 F. Supp. 3d at 916. The district court determined that returning the child to Honduras would not expose her to a grave risk of harm, notwithstanding the lack of any protective measures. <u>See</u> <u>Golan v. Saada</u>, 142 S. Ct. 1880, 1892 (2022) ("The question whether there is a grave risk . . . is separate from the question whether there are ameliorative measures that could mitigate that risk."); <u>Simcox</u>, 511 F.3d at 608 ("Once the district court determines that the grave risk threshold is met, only then is the court vested by the Convention with the *discretion* to refuse to order return. It is with this discretion that the court may then craft appropriate undertakings."). In light of its determination that no such risk existed, the district court did not err in ordering the child's return.

The judgment is affirmed.

_____